UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DERRYL WATSON,

     Plaintiff,

                                 Civil Case No. 16-13770

v.                                Honorable Linda V. Parker

CHARLES JAMSEN, ET AL.,

     Defendants.

_____/

**OPINION AND ORDER (1) SUSTAINING PLAINTIFF'S OBJECTION [ECF NO. 95]; (2) REJECTING MAGISTRATE JUDGE'S AUGUST 9, 2019 REPORT AND RECOMMENDATION [ECF NO. 92]; AND (3) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 79]**

This is a prisoner civil rights action brought by Plaintiff Derryl Watson, a Michigan Department of Corrections' ("MDOC") inmate, against Defendants Dr. Charles Jamsen and Physician Assistant Mary Boayue, who provided medical care to Plaintiff following reconstructive surgery to fix deformities in his left foot. Upon discharge, Plaintiff's surgeon detailed an eight-part treatment plan for Plaintiff's surgical wounds—a plan the record shows was not followed. Plaintiff alleges deliberate indifference to his serious medical needs in violation of the Eighth Amendment under 42 U.S.C. § 1983. (Compl., ECF No. 1.) Defendants argue that their actions and inactions show no more than negligence, which does not meet the more demanding standard of deliberate indifference.

The matter has been assigned to Magistrate Judge R. Steven Whalen for all pretrial proceedings, including a hearing and determination of all non-dispositive matters pursuant to 28 U.S.C. § 636(b)(1)(A) and/or a report and recommendation (R&R) on all dispositive matters pursuant to 28 U.S.C. § 636(b)(1)(B). Before the Court is an R&R filed by Judge Whalen, which recommends that Defendants' motion for summary judgment be granted. (ECF Nos. 79, 92.) Plaintiff filed an objection to the R&R on September 11, 2019. (ECF No. 95.) Defendants responded to the objection on September 23, 2019. (ECF No. 96.)

For the reasons stated below, the Court (i) sustains Plaintiff's objection; (ii) rejects the R&R; and (iii) denies Defendants' motion for summary judgment.

**BACKGROUND**

On March 10, 2016, the MDOC transferred Plaintiff to G. Robert Cotton Correctional Facility ("JCF") to see a podiatrist in Jackson County. (Defs.' Mot., ECF No. 79 at Pg. ID 538.) On March 18, MDOC transported Plaintiff to Duane Waters Hospital, where Plaintiff and Dr. Matthew Page, the podiatrist, agreed that Plaintiff would undergo surgery to fix his deformed foot. (*Id*. at 538-39.) In the "Plan" section of a "Consultation Note," Dr. Page wrote, among other things, that Plaintiff will use "crutches for approximately two weeks," "a boot . . . for an additional four weeks," and "[a]dvised two months for fairly complete recovery."

(Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 586.)  Defendant Boayue electronically

signed this Consultation Note on the same day.  (*Id*.)

On April 19, Dr. Page performed reconstructive foot surgery on Plaintiff and

bandaged Plaintiff's wounds.  (Defs.' Mot., ECF No. 79 at Pg. ID 539).  In an

"Authorization Letter" drafted at 2:27 PM on that day, Dr. Page outlined a

treatment plan that included (i) JCF "[changing] dressing in 3 days"; (ii) "Norco,"

a type of pain medication; (iii) crutches; (iv) a boot; (v) "keep[ing] [the wounds]

dry [in] shower[s]"; (vi) "ice detail"; (vii) "extra pillows"; and (viii) "2 week[s] for

suture removal."  (Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 614.)  In "Discharge

Instructions" drafted three minutes later, at 2:30 PM, Dr. Page repeated much of

the same instruction included in the Authorization Letter but also checked boxes

labeled "[d]o not remove outer dressing until follow-up appointment" and "[c]all

the office to schedule or confirm your follow-up appointment date and time."  (*Id*.

at 604.)

The Discharge Instructions also listed information about when surgery

patients should call their doctor, including if (i) "you have bright red bleeding or

develop bleeding that concerns you"; (ii) "you develop signs of infection," such as

"[r]edness and or warmth on your incision" or "[s]welling at the incision site"; or

(iii) "your pain is not relieved or controlled."  (*Id*. at 605.)

Upon Plaintiff's return to JCF later that day, Defendant Boayue updated Plaintiff's chart, noting in the "Additional Comments" section under "History of Present Illness" four out of eight of Dr. Page's instructions, including Norco, an ice detail, crutches, and a pillow. (*Id*. at 610-11.)

At that time, Defendant Boayue ordered the pain medication and the request was approved the same day. (*Id*. at 612-13.) However, Plaintiff's medical records do not show that Defendant Boayue ordered an ice detail, crutches, pillows, or any other item included in Dr. Page's April 19 Authorization Letter.[1]

On the next day, April 20, Defendant Jamsen—a doctor and medical provider ("MP") for JCF inmates—signed, dated, and timestamped the "Reviewed By" section of Dr. Page's Authorization Letter. (*Id*. at 614.) Defendant Jamsen requested a "[p]odiatry surgery follow up," noting that "Dr. Page requests 2 week f/u for suture removal." (*Id*. at 615.) Though the request was approved on April 22, (*Id*. at 617-18), Plaintiff's medical records do not show that any JCF medical personnel in fact scheduled a follow-up appointment at or around this time.

---

[1] As discussed below, on April 25, Plaintiff states that he needs his ice and pillow details "extended." It is unclear if this means Plaintiff received ice and pillows at some point between April 19 and April 25. Even if Plaintiff received ice and pillow details during this time period, he was no longer receiving these items by May 3, according to a Grievance Form dated on that day. (Pl.'s Resp., ECF No. 83 at Pg. ID 1158.)

During the three weeks that followed, Plaintiff sought help from medical personnel numerous times:

- April 25: Plaintiff sent a kite to JCF medical personnel. The kite stated that Plaintiff needed (i) "[his] ice detail extended"; (ii) [his] "extra pillow extended"; (iii) the "MP [to] check pins and rods in [his] foot"; and (iv) "to see [his] MP before [his] next schedule[d] Podiatry appointment." (*Id*. at 620.) In response, the medical personnel noted that Plaintiff's request was "[s]ent to MP to review" and a "[c]hart [r]eview/[u]pdate" was scheduled for "approx 04/29/2016 with Physician." (*Id*.)

- May 1: In a "Grievance Form" based on the conduct of Defendant Jamsen and all "unavailable" medical staff, Plaintiff stated that (i) he has not yet been seen by an MP, in violation of MDOC policy which Plaintiff said "states that a prisoner who's been seen or treated off-site for procedures or treatment SHALL be seen by the institution's Medical Provider upon the prisoner's return"; (ii) to date, no one had checked or changed his dressings, or checked his foot "for possible infection (a major concern after surgery)," even though he "was told by the off-site surgeon [that it] needed to be done"; and (iii) his "medical details didn't cover a satisfactory recovery or rehabilitation plan." (Pl.'s Resp., ECF

5

No. 83 at Pg. ID 1150.)  Plaintiff also recounted the events of April 25 and further stated that, on April 29, he again asked to see an MP and to have his medical details extended—but to no avail.  (*Id.*)[2]  "This refusal to examine or see me or even do a competent chart review," Plaintiff wrote, "has allowed all my medical details to expire and run out and still not address my serious medical needs."  (*Id.*)

- <u>May 2</u>:  Plaintiff sent a kite to JCF medical personnel, requesting a pain medication refill.  Though the "Kite Response" states "Comment:  Meds ordered," (Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 622), Plaintiff's medical records do not show that any pain medication was ordered that day—but, when JCF medical personnel ordered pain medication at other times, such orders were reflected in Plaintiff's medical records.  (*See e.g.*, *id.* at 619, 645.)

- <u>May 3</u>:  In a second Grievance Form based on the conduct of Defendants Jamsen and Boayue, among others, Plaintiff stated that earlier that day, after reporting "extreme pain" to his unit officer, he was wheeled over to the JCF HealthCare unit, where he waited for two hours before

---

[2] JCF responded to Plaintiff's grievance form twelve days letter, on May 13, and largely recounted the care Plaintiff received on and after May 5.  (Pl.'s Resp., ECF No. 83 at Pg. ID 1151-54.)

Defendant Boayue saw him.  (Pl.'s Resp., ECF No. 83 at Pg. ID 1158.)

Plaintiff contends that, after complaining of extreme pain and bleeding,

Defendant Boayue offered him Motrin and refused to change his

dressings or check his surgical wounds.  (*Id.*)

- May 5:  Plaintiff told JCF medical personnel that "[he] bled through the

   dressings and it stinks," "[his] foot hurts really bad," and he's "[b]een out

   of pain meds for 4 or 5 days now."  (Defs.' Mot., Ex. C, ECF No. 80 at

   Pg. ID 623.)  In response, the medical personnel noted in a "Nurse

   Protocol" note that she examined Plaintiff's foot, which revealed

   "[t]enderness," "[p]ain with movement," and "[w]eakness."  (*Id.*)  The

   medical personnel further noted that Plaintiff "[s]till had dressing from

   surgery on 4-19-16 [and] [f]oot quite odiferous," as well as "[r]eferred to

   provider (Charles S. Jamsen MD)" and "[p]hysician contacted for same

   day treatment and orders."  (*Id.* at 623-24.)  The medical personnel also

   noted in a "Clinical Progress Note" that she "[s]poke with MP2[3] about

   the soiled dressing, odor and pain in foot [and] MP2 read post op

   instructions.  Stated inmate should not have dressing changed until F/U

---

[3] Based on Defendant Jamsen's testimony, (Defs.' Mot., ECF No. 79-1 at Pg. ID
562-63), the Court assumes "MP2" references Defendant Jamsen.

appointment with surgeon. . . . Informed inmate of MP2's decisions.

Inmate very unhappy." (*Id*. at 625.) The medical personnel gave

Plaintiff Tylenol and Naprosyn, contacted an off-site coordinator

regarding Plaintiff's follow-up appointment with Dr. Page, and noted that

Plaintiff "has a follow up appointment with Dr. Page very soon." (*Id*.)

The appointment was set for the following day, May 6. (Defs.' Mot.,

ECF No. 79-1 at Pg. ID 562.)

On May 6, MDOC transported Plaintiff to Dr. Page's office. (Defs.' Mot.,

ECF No. 79 at Pg. ID 540.) Dr. Page's Consultation Note reads in relevant part:

> Identifying Data: "[Plaintiff] states that upon discharge . . . he
> checked in with the nurse in health care. He was advised that he
> would see the physician at his facility the following day. He states
> that he has not seen any care provider since his surgery and he has
> not had his bandages changed on his foot since his surgery. He states
> he did receive Norco for pain, however that prescription ran out this
> past Sunday. His current pain level is 5/10 . . . . [and] the details for
> his ice and extra pillow have expired. He notes some odor coming
> from the bandages on his left foot. He states the bandage is blood-
> soiled, [and] there is pain . . . ."

> Physical Examination: "Upon removing [boot on the left foot], there
> is a blood-soiled, well-adhered bandage to his toes and foot. This is
> the surgical bandage that was placed on in the OR at the time of
> surgery. Upon removing this, there is significant adherence to the []
> toes and [] incisions. Upon removing all of the bandages, there is
> superficial dehiscence of the bunion incision along the entire length.
> . . . There is postoperative edema throughout the whole foot []. The
> pins in the . . . toes . . . are dry and intact distally. The . . . left third

toe has an ulcerative area and skin breakdown from the soiled bandages. This is the size of a dime extending into the dermal level."

Plan: "Bandages were removed today. Photographs of the bandages along with his foot and areas of concern were obtained along with the review of the medical record which did show specific postoperative orders for his bandage to be changed three days following his surgical procedure. . . . Aquacel AG was applied to the ulcerative area . . . as well as the bunion incision. . . . Specific orders were written today for extra pillow for elevation, ice detail, pain management with tramadol . . . for two weeks. I also prescribed Cipro . . . and clindamycin . . . since the wounds have dehisced and now there is an ulcer. Thankfully I believe this will heal with good wound care. . . . There was some backing out of the pin in . . . toe from about 1 cm."

(Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 627-28.) Dr. Page also drafted an additional Authorization Letter on May 6, which stated "POSTOP 4-19-16 . . . see dictation and orders." (*Id*. at 626.)

When Plaintiff returned from his visit with Dr. Page on that day, he met with JCF medical personnel, complaining of "9/10" pain. (*Id*. at 630.) The medical personnel noted in a "Consultation" document that Plaintiff was seen by Dr. Page "when his dressing was noted to be blood-soiled, and adhered to the incisions" and there was "dehiscence and "ulceration" where "the original surgical dressing was removed today." (*Id*. at 631.) The document further noted that Plaintiff's "[p]resumed [d]iagnosis" was "wound, open, foot w/cmpl," that another "F/U visit" "to recheck the wounds" and "for post op complications" was scheduled for

9

"05/13/16," and that "NP Liu [was] notified of suggested new orders from

Podiatrist." (*Id*. at 630-31.)

Later on May 6, Plaintiff met with Dr. Liu, a Nurse Practitioner at JCF, who

wrote the following:

> "Pt . . . upset over the status and treatment he received regarding his
> leg since his surgery 19 days ago."

(*Id*. at 636.)

> "Pt was to have dressing changes to start 2-3 days after surgery and
> [MP] follow-up. Pt was not seen. Orders were written for
> medications, but not for wound care. Pt was seen today . . . by Dr[.]
> Page. Dr. Page was livid due to NO dressing changes done at all. Pt
> had to have dressings cut off today and has a dehiscence of the
> bunion surgery and ulceration . . . . Pt also has 1 pin backing out in
> . . . toe. Pt is now on 2 antibiotics, and will have wound care daily.
> [Dr. Page] is requesting 2 weeks of pain meds due to wound issue
> and ulceration."

(*Id*. at 640.)

Dr. Liu noted that Plaintiff had "ulcerating" "skin lesions," which were

associated with "pain and bleeding." (*Id*. at 637.) Dr. Liu drafted orders for (i)

daily dressing changes; (ii) "7 large bags per week" and "2 rubber bands to close

the bags," so that Plaintiff could "cover his foot/boot for showers"; (iii) "ice given

x 2 weeks"; (iv) "extra pillow for elevation"; (v) Cipro and Clindamycin, two types

of antibiotics, as well as emergency orders for (vi) Ultram, a type of pain

medication and (vii) a below-the-knee immobilizer boot. (*Id*. at 636-38, 640, 646.)

10

On May 9, Dr. Liu also ordered crutches for Plaintiff. (*Id*. at 658.) Later that day, Defendant Jamsen signed, dated, and timestamped the "Reviewed By" section of Dr. Page's May 6 Authorization Letter, noting that he "spoke with Dr. Page [on] 5/09/16" by phone, "[r]econfirmed [the] wound care orders," and "[r]eviewed [the] current wound care orders and [the] past wound care orders that were not followed." (*Id*. at 626, 661.) Defendant Jamsen also wrote that, moving forward, Plaintiff "[did] not need[] daily wound care." (*Id*. at 661.) Rather, Dr. Page would change Plaintiff's dressing during the next visit scheduled in 4 or 5 days and, in the meantime, JCF medical personnel would check Plaintiff's wounds daily to see if drainage was leaking through the bandages. (*Id*. at 661, 664-65.)

## RELEVANT PROCEDURAL HISTORY

Plaintiff brought suit on October 21, 2016, alleging that Defendants Jamsen and Boayue violated Plaintiff's constitutionally protected right to be free from cruel and unusual punishment by being deliberately indifferent to Plaintiff's serious medical need of adequate aftercare following major reconstructive foot surgery. (Compl., ECF No. 1.) Defendants moved for summary judgment on September 26, 2018. (Defs.' Mot., ECF No. 79.)

The August 9, 2019 R&R recommends that the Court grant Defendants' motion because Plaintiff failed to meet the "objective component" of the deliberate

indifference analysis because (i) Plaintiff did not show that the "ongoing treatment" "was so grossly incompetent as to shock the conscience"; (ii) Plaintiff did not "produce verifying medical evidence that establishes the 'detrimental effect' of the inadequate treatment" or the "causal relationship between the allegedly inadequate treatment and any subsequent complications"; and (iii) Dr. Page does not attribute Plaintiff's infection "to a lack of dressing change between April 19 and May 6, 'because it is unknown whether [Plaintiff's] hardware would have been infected anyway if his dressing had been changed before his initial follow-up visit.'" (R&R, ECF No. 92 at Pg. ID 1222.) The R&R further states that Plaintiff failed to meet the "subjective component" because (i) Plaintiff's allegations reflect only "disagreement with the treatment provided"; (ii) "Plaintiff received extensive medical attention"; and (iii) Defendants' conduct did not amount to more than "error[] in medical judgment or other negligent behavior," which does not constitute deliberate indifference. (*Id*. at 1223.)

Plaintiff objected to the R&R on the ground that, while the magistrate judge considered the care Plaintiff received *after* May 5, the magistrate judge failed to consider the *lack* of care Plaintiff received *between* April 19 and May 5, the time period upon which Plaintiff based his Eighth Amendment claims. (Pl.'s Obj., ECF No. 95 at Pg. ID 1235.)

12

Defendants responded to Plaintiff's objection, arguing that the R&R reached the correct conclusion because (i) Defendant Jamsen was notified of Plaintiff's complaints for the first time on April 25; (ii) Plaintiff failed to provide medical evidence to establish a detrimental effect; and (iii) it is unknown whether Plaintiff's hardware would have become infected even if Plaintiff's dressing had been changed between April 19 and May 5.[4] (Defs.' Resp. to Obj., ECF No. 96.)

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 72(b) and 28 U.S.C. § 636(b)(1), the Court conducts a *de novo* review of the portions of the magistrate judge's R&R to which a party has filed "specific objection[s]" in a timely manner. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). A general objection or one that does nothing more than disagree with a magistrate judge's determination,

---

[4] In their motion for summary judgment and response to Plaintiff's objection, Defendants elicit the Sixth Circuit's language in *Rhinehart*, which states that "[w]hen a doctor orders treatment consistent with the symptoms presented and then continues to monitor the patient's condition, an inference of deliberate indifference is unwarranted." (Defs.' Mot., ECF No. 79 at Pg. ID 558; *see also* Defs.' Resp. to Obj., ECF No. 96 at Pg. ID 1243) (quoting *Rhinehart*, 894 F.3d at 743). Yet Defendants fail to apply this case law to the facts here and fail to explain how the case law supports any of their arguments. In addition, the case at bar is distinguishable from *Rhinehart*, where the Sixth Circuit found no deliberate indifference when prison doctors prescribed an *alternative* treatment instead of treatment recommended by a specialist. Here, the record does not show that Defendants prescribed any alternatives to Dr. Page's April 19 orders.

13

"without explaining the source of the error," is not considered a valid objection. *Washington v. Jenkins*, 2015 WL 5729148, at \*4 (E.D. Mich. Sept. 30, 2015) (quoting *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)).

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial." *Washington*, 2015 WL 5729148, at \*4 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact." *Celotex*, 477 U.S. at 323 (citation omitted); *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In making this evaluation, the court must

examine the evidence and draw all reasonable inferences in favor of the non-moving party." *Washington*, 2015 WL 5729148, at *5 (citing *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984)).

## ANALYSIS

"[P]risoners have a constitutional right to medical care" under the Eighth Amendment's prohibition against cruel and unusual punishment. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "This right is violated when officials are 'deliberately indifferent' to an inmate's serious medical needs." *Washington*, 2015 WL 5729148, at *5 (citing *Comstock*, 273 F.3d at 702). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle*, 429 U.S. at 104 (citation omitted). To show "deliberate indifference" and thus establish an Eighth Amendment claim, a plaintiff must satisfy two components: one objective and the other subjective. *Comstock*, 273 F.3d at 702.

"To satisfy the objective component, the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id*. at 702-03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment *or* one that

15

is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 834). However, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 838). Further, while "courts are generally reluctant to second guess medical judgments" when inmates allege that their treatment was inadequate, "it is possible for medical treatment to be 'so woefully inadequate as to amount to no treatment at all.'" *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (quoting *Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir.1976)).

To properly analyze this case, the Court must consider the actions (and inactions) Defendants took between April 19 and May 5—not the actions that took

place after May 5, or over the total course of Plaintiff's post-surgery treatment. It was the lack of care during this earlier time period which, according to Plaintiff, constitutes the deliberate indifference to his serious medical need. Analyzing the case any other way would be an error akin to that flagged by the Sixth Circuit in *Boretti v. Wiscomb*, where they "agree[d] with plaintiff that the magistrate's report ignore[d] the alleged *lack* of medical care which plaintiff experienced" and complained of in his pleadings—specifically "the refusal to treat the [plaintiff's] wound for five days or to provide dressings or pain medication." 930 F.2d 1150, 1154 (6th Cir. 1991) (emphasis added). After reviewing the record from the proper perspective, the Court disagrees with the magistrate judge's conclusion that Plaintiff failed to allege sufficient facts from which a trier of fact could conclude that the objective and subjective components of the Eighth Amendment claim are satisfied.

## Objective Component

Though the magistrate judge stated that Plaintiff's "foot condition" constitutes a "serious medical condition," (R&R, ECF No. 92 at Pg. ID 1222), both the magistrate judge and Defendants focus their analyses on an infection diagnosed after May 5 and appear to improperly characterize this subsequent infection as the serious medical condition at issue. (*Id.*; Defs.' Mot., ECF No. 79 at Pg. ID 556-

17

57.) To be clear, Plaintiff points to the *surgical wounds* following the April 19 reconstructive foot surgery—not a later infection—as the relevant serious medical condition, (Compl., ECF No. 1 at Pg. ID 3-8; *see also* Pl.'s Obj., ECF No. 95 at Pg. ID 1234-36), and because Dr. Page mandated treatment and follow-up care after Plaintiff's foot surgery, a reasonable jury could find that the surgical wounds alone satisfy the objective component of the Eighth Amendment analysis. *See Blackmore*, 390 F.3d at 897 (citing *Gaudreault*, 923 F.2d at 208); *Richmond v. Huq*, 885 F.3d 928, 938 (6th Cir. 2018) (finding that the objective component is satisfied when physicians prescribed daily treatment and dressing changes for inmate's burn wounds); *Boretti*, 930 F.2d at 1155–56 (reversing summary judgment where prescribed plan of treatment that included daily dressing changes for inmate's wounds created duty to carry out).

Indeed, a reasonable jury could also find that—based on Plaintiff's four (or six) complaints within a three-week window—Plaintiff's surgical wounds were in obvious need of medical care and Defendants' failure to attend to these needs led to Plaintiff's extreme pain and bleeding, as well as the indecent necessity of dragging about a foot wrapped in bloody, wet, and odorous bandages for weeks after surgery. *Id*. at 1154 (finding that forcing inmate to "endure physical pain and mental anguish during the time he was denied any dressings for the wound or pain

medication" may constitute Eighth Amendment violation); *Parrish v. Johnson*, 800 F.2d 600, 611 (6th Cir. 1986) (citation omitted) ("[A] plaintiff may recover for any injury caused by delay in care and any concomitant pain, suffering, or mental anguish"); *Westlake*, 537 F.2d at 860 (finding that "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering"); *Boretti*, 930 F.2d at 1154-55 (citation omitted) (reversing summary judgment where plaintiff was forced to carry out "measures [] inconsistent with contemporary standards of common decency" when defendants ignored plaintiff's "several direct requests," refusing to check plaintiff's wound or change the dressing, and forcing plaintiff to clean wound with soap, toilet tissue, and water); *Estelle*, 429 U.S. at 103 (finding that unnecessary suffering due to denial of medical care is inconsistent with contemporary standards of decency).

Notably, in this case, Plaintiff need not show that the "ongoing treatment" "was so grossly incompetent as to shock the conscience." As the Sixth Circuit previously explained, such a showing is not required when a plaintiff shows that the medical need was "diagnosed by the physician as mandating treatment" and the defendant failed to provide such treatment, *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Blackmore*, 390 F.3d at 897), or the defendant provided

treatment "so cursory as to amount to no treatment at all," *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (quoting *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002)). Both of these scenarios are present here: Plaintiff had a prescribed treatment plan and Defendants did arguably nothing—in the form of checking, much less changing Plaintiff's bandages—for nearly three weeks.[5] *See Gibbs v. Norman*, 1995 WL 411829 at *4 (6th Cir. Jul. 11, 1995) (unpublished) (citing *Boretti*, 930 F.2d 1150) (describing failure to administer pain medication and dressing changes to inmate's leg wound in *Boretti* as "a complete denial of medical care").

<u>Subjective Component</u>

A careful review of the events pertaining to the April 16 through May 5 timeframe could also lead a reasonable jury to find that Defendants (i) subjectively perceived facts from which to infer that the surgical wounds posed a substantial

---

[5] The record does not suggest that Defendants did much more regarding Dr. Page's instructions for crutches, a boot, keeping Plaintiff's surgical wounds dry when Plaintiff showered, an ice detail, extra pillows for elevation, ensuring an appointment was scheduled for two weeks after Plaintiff's surgery (instead of three weeks after), and ensuring Plaintiff's pain medication order did not lapse. Notably, Defendants offer no explanation for failing to fully implement these portions of the post-surgical treatment plan and a jury could find that the little that Defendants did do amounted to no treatment at all.

risk to Plaintiff; (ii) that Defendants did in fact draw the inference; and (iii) then disregarded that risk.

*Defendants Perceived Facts of Substantial Risk*

First, Plaintiff's medical records contained at least three references to Dr. Page's treatment plan and orders: the March 18 Consultation Note, the April 19 Authorization Letter, and the April 19 Discharge Instructions, which make clear that Plaintiff needed (i) a dressing change in three days; (ii) pain medication (iii) crutches; (iv) a boot; (v) to "keep [the wound] dry [in] shower[s]"; (vi) "ice detail"; (vii) "extra pillows"; and (viii) "2 week[s] for suture removal." (Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 614.)

Second, Plaintiff's medical records contained at least four complaints—and, in one case, notes written by JCF medical personnel—of his surgical wounds bleeding, causing pain, and/or omitting a foul odor: the April 25 kite, the April 29 visit to JCF HealthCare, the May 2 kite, and the May 5 visit to JCF HealthCare.[6]

Of course, a jury could find that Defendant Boayue "perceived"—in other words, saw or became aware of—these facts on several occasions: (i) on March

---

[6] To the extent that Grievance Forms related to medical services are placed in inmate's medical records, Defendants had two additional sets of facts from which to perceive the substantial risk of Plaintiff's surgical wound: the May 1 and May 3 Grievance Forms.

18, when she electronically signed Dr. Page's March 18 Consultation Note; (ii) on April 19, when she updated Plaintiff's chart based on Dr. Page's April 19 Authorization Letter and Discharge Instructions; and/or (iii) on May 3, when—according to the Grievance Form filed that day—Plaintiff visited her to complain of bleeding and pain, and she would have reviewed his medical chart which contained all of Dr. Page's documentation, as well as Plaintiff's complaints from April 25, April 29, and May 2. *See Richmond*, 885 F.3d at 940 ("A reasonable jury could find that [defendant] reviewed or should have reviewed [plaintiff's] chart, which would have made him aware of the risk that the [j]ail medical staff had and would continue to fail to adhere to his prescribed plan of care, and that he subsequently disregarded that risk by failing to ensure that his orders were implemented as prescribed. This is especially true in light of [plaintiff's] well-documented complaints.").

Additionally, a reasonable jury could find that Defendant Jamsen also became aware of these facts on several occasions:  (i) on April 20, when he signed the "Reviewed By" section of the April 19 Authorization Letter; (ii) on or around April 25, when JCF medical personnel sent Plaintiff's complaint from that day "to [the] MP to review"; and/or (iii) on or around May 5, when JCF medical personnel referred Plaintiff's complaint from that day "to provider (Charles S. Jamsen MD)"

22

and Defendant Jamsen, before informing the medical personnel of the decision not to change Plaintiff's bandages until the follow-up appointment with Dr. Page, would have reviewed Plaintiff's medical chart which contained all of Dr. Page's documentation, as well as Plaintiff's complaints from at least April 25, April 29, and May 2.

*Defendants Drew the Inference of Substantial Risk*

The fact that Defendant Boayue transferred *at least some* of the eight instructions outlined in Dr. Page's April 19 orders to Plaintiff's medical chart suggests that she understood, acknowledged, and drew the inference that Plaintiff's surgical wounds posed a risk to him. *See Comstock*, 273 F.3d at 704 (finding that medical provider's notes remarking on plaintiff's condition evidenced subjective inference of substantial risk). Moreover, the fact that both Defendants took steps to order the Norco prescribed by Dr. Page, presumably to provide Plaintiff relief from his post-surgery pain, provides further evidence of the same. However, not only do Defendants' affirmative actions provide evidence that they in fact drew inferences about the substantial risk to Plaintiff, but also their *inactions* provide additional evidence.

It is well settled that a defendant cannot "escape liability" under the subjective standard by simply refusing to acknowledge or "verify underlying facts

23

that he strongly suspected to be true," or failing to "confirm inferences of risk that he strongly suspected to exist." *Id*. at 703 (quoting *Farmer*, 511 U.S. at 843 n.8). "Whether [a defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. The record includes several pieces of such evidence.

For example, in their motion for summary judgment and response to Plaintiff's objection, Defendants unequivocally state that Dr. Page's April 19 Authorization Letter and Discharge Instructions "provided *contradictory* instructions": one stated that JCF should "[change] dressing in 3 days" and the other stated that JCF should "not remove outer dressing until follow-up appointment." (Defs.' Mot., ECF No. 79 at Pg. ID 557 (emphasis included); Defs.' Resp. to Obj., ECF No. 96 at Pg. ID 1243.) Thus, Defendants argue, they "relied upon the post-operative instruction[]" to not change Plaintiff's dressing "until the follow-up appointment with Dr. Page." (Defs.' Mot., ECF No. 79 at Pg. ID 557.) This argument holds no water. In *Boretti*, where confusion existed as to the exact nature of an inmate's treatment plan, the Sixth Circuit made clear that they "do not believe one phone call to [an external party] to confirm plaintiff's pain medication is too difficult a task for [the defendant] to perform or beyond her scope of

authority." 930 F.2d at 1154; *see also Richmond*, 885 F.3d at 942 (finding deliberate indifference may exist where defendant aware of notations in medical chart and failed to take steps like prescribing medication herself, or checking with outside doctor or pharmacy to verify). This case is no different, especially considering that on May 9 Defendant Jamsen—*in a single phone call*—confirmed Dr. Page's original orders, which Defendant Jamsen later stated "were not followed." (Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 661.) Of course, both Defendants possessed the ability to pick up the phone and dial Dr. Page's office at any point between April 19 and May 5, yet both opted not to do so.

The Defendants further explain that, faced with the conflicting instructions, they "took steps in good faith to implement appropriate post-surgical medical care." This statement is no different than the one offered in *Boretti*—specifically, that the defendant "used her professional judgment in determining that plaintiff's wound had been properly attended to . . . and could wait to be checked." 930 F.2d at 1155. There, the Sixth Circuit described this argument as "[in]sufficient to establish that there is an absence of evidence to support plaintiff's case" because the defendant could have verified the treatment plan instructions and whether they were being followed. *Id.* Here, the May 9 phone call with Dr. Page cured the confusion and led Defendant Jamsen to conclude that the original treatment plan

25

was not followed:  these facts could lead a reasonable jury to find disingenuous any argument suggesting a need for medical judgment beyond that required to make a single phone call, or describing any action beyond such a phone call as a "good faith" step to implement medical care.

Moreover, after Plaintiff's May 6 visit with Dr. Page, Dr. Liu—not Defendants—referenced Dr. Page's *original* treatment plan to order, among other things, crutches and materials so that Plaintiff could "cover his foot/boot for showers."  In addition, Dr. Liu wrote an *emergency* order for Plaintiff's pain medication, (Defs.' Mot., Ex. C, ECF No. 80 at Pg. ID 646)—medication that Defendants do not deny Plaintiff went without for approximately four or five days. If Dr. Liu, a medical colleague, subjectively drew the inference of substantial risk based on Dr. Page's original orders and Plaintiff's complaints (a risk so great that it required an emergency order, as opposed to a regular one), a reasonable jury could find untruthful Defendants' argument that they did not draw such inferences themselves.

*Defendants Disregarded the Substantial Risk*

To be sure, a reasonable jury could also find that Defendants consciously disregarded the known risk of substantial harm to Plaintiff by failing to write orders for the eight items prescribed in Dr. Page's original treatment plan—either on April 19, when Plaintiff's post-surgery treatment plan began, or between April 19 and May 5, when Defendants individually learned or should have learned that the pain medication order lapsed and the treatment plan was otherwise not being strictly followed.

In addition, despite Plaintiff flagging time and again events that the Discharge Instructions detailed as reasons surgery patients should seek their doctor—including "bleeding that concerns [Plaintiff]'" and "pain [that] is not relieved or controlled"—Defendants offered Plaintiff Tylenol or Motrin and told him to wait. In the end, the possibility that Defendants "fail[ed] to treat [Plaintiff] or d[id] less than their training indicated was necessary" precludes summary judgment. *Williams v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999).[7]

---

[7] Though Defendants argue that "[w]here a prisoner has received *some* medical attention . . ., federal courts are generally reluctant to second guess medical judgments," (Defs.' Mot., ECF No. 79 at Pg. ID 537, 555-56, 558 (emphasis added)), the issue is not whether Defendants provided *some* medical attention to Plaintiff, but rather whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. "Defendants' position is, apparently, that if a prison doctor offers some treatment, no matter how insignificant, he cannot be found deliberately indifferent. This is not the law: as the Supreme Court noted in *Estelle*, 429 U.S. at 104–05 & n.10, a prison doctor's [] response . . . may constitute deliberate

27

## CONCLUSION

Having carefully reviewed the R&R, the Court disagrees with the conclusions reached by the magistrate judge. The Court finds that summary judgment is not appropriate because Plaintiff sets forth sufficient evidence to create genuine issues of material fact regarding whether Defendants' conduct reflects deliberate indifference to Plaintiff's serious medical needs.

Accordingly,

**IT IS ORDERED** that Plaintiff's objection to the R&R (ECF No. 95) is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the R&R (ECF No. 92) is **REJECTED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (ECF No. 79) is **DENIED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 24, 2019

---

indifference just as readily as the intentional denial or delay of treatment."
*Comstock*, 273 F.3d at 707 n.5.

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, September 24, 2019, by electronic and/or U.S. First Class mail.

s/ R. Loury_____
Case Manager