# EXHIBIT

# A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DERRYL WATSON, #148946

    Plaintiff,

v.

JAMSEN et al

    Defendants,

Case No.: 2:16-cv-13770
District Judge: Linda V. Parker
Magistrate Judge: Anthony P. Patti

| | |
|---|---|
| THE LAW OFFICE OF KEITH ALTMAN<br>Keith Altman (P81702)<br>Attorney for Plaintiff<br>33228 West 12 Mile Rd., Suite 375<br>Farmington Hills, MI 48331<br>(516) 456-5885<br>kaltman@lawampmmt.com<br><br>RADNER LAW GROUP, PLLC<br>Solomon M. Radner (P73653)<br>Co-Counsel for Plaintiff<br>17515 W. Nine Mile Rd., Ste. 1175<br>Southfield, MI 48075<br>(313) 355-3425<br>solomon@radnerlawgroup.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A.,<br>LL.M. (P37603)<br>Nicholas B. Pillow (P83927)<br>Attorneys for Charles Jamsen, M.D.,<br>Keith Papendick, M.D. and<br>Mary Boayue, P.A.<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>npillow@chapmanlawgroup.com |

## DEFENDANT KEITH PAPENDICK, M.D.'S MOTION FOR SUMMARY JUDGMENT

    NOW COMES Defendant KEITH PAPENDICK, M.D., by and through his attorneys, CHAPMAN LAW GROUP, and for his Motion for Summary Judgment states as follows:

1. Plaintiff filed his Complaint in this matter on October 21, 2016. (**ECF No. 1**).

2.  On May 24, 2018, the Court granted Plaintiff's request to supplement his Complaint to add Keith Papendick, M.D. ("Dr. Papendick") as a Defendant. (**ECF Nos. 54** and **62**).

3.  Plaintiff's supplement to the Complaint did not alter his claims against Defendants Charles Jamsen, M.D. and Mary Boayue, P.A., but rather added three (3) ancillary deliberate indifference allegations against Dr. Papendick related to Dr. Papendick's denial of specialty medical consultation requests ("407s") and a First Amendment retaliation claim alleging Dr. Papendick denied the 407s because Plaintiff had brought this lawsuit. (**ECF No. 54**).

4.  More specifically, Plaintiff alleges that Dr. Papendick, in retaliation for his bringing this lawsuit, denied Plaintiff's specialty medical consultation requests for a podiatric follow up appointment, for orthopedic shoes, and for an orthopedics consultation related to a hand issue known as Dupuytren Contracture[1]. (**ECF No. 54**).

5.  On February 1, 2021, Chapman Law Group filed its appearance as Counsel for Dr. Papendick. (**ECF No. 112**).

---

[1] "Dupuytren's contracture is a hand deformity that usually develops over years. The condition affects a layer of tissue that lies under the skin of your palm. Knots of tissue form under the skin — eventually creating a thick cord that can pull one or more fingers into a bent position." "Dupuytren's Contracture," Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/symptoms-causes/syc-20371943

6. The Case was referred to Magistrate Judge Anthony Patti for trial on July 7, 2021. (**ECF No. 124**).

7. Following a Status Conference on December 13, 2021, Plaintiff waived any further discovery as to Dr. Papendick and a final pretrial Conference was set for January 24, 2022. (**ECF No. 128**).

8. On April 14, 2022, the Court issued the Joint Final Pretrial Order, wherein, neither Plaintiff's claims section nor the issues to be litigated sections contain any mention of the claims against Dr. Papendick alleged in Plaintiff's Supplemental Complaint. (**ECF NO. 132**).

9. Pursuant to Fed. R. Civ. P. 16(e) and E.D. Mich. L.R. 16.2, the Joint Final Pretrial Order supersedes the pleadings and governs the course of trial unless modified by further order. Any claims or defenses not raised in the final pretrial order are forfeited and deemed waived. *See Gregory v. Shelby Cty., Tenn.,* 220 F.3d 433, 442-43 (6th Cir. 2000) ("This Circuit has held that a party's failure to advance a theory of recovery in a pretrial statement constitutes waiver of that theory."); *Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint . . . .").

10. As none were included in the Joint Final Pretrial Order, all of Plaintiff's claims against Dr. Papendick should be deemed waived and dismissed with prejudice.

To hold otherwise would subject Defendants, and Dr. Papendick specifically, to trial by surprise.

11. On the merits, Plaintiff's Medical records (**ECF No. 80,** ***filed under seal*, and Exhibit A**), show that each denial of the at issue 407's was based on Dr. Papendick's determination that the requested treatment was not medically necessary, and an alternative treatment plan was put into place. (*See* **ECF No. 80,** ***filed under seal*, p. 519; Exhibit A pp. 15; 41; 49; 63; and 73**).

12. While the Supreme Court has held that deliberate indifference to the serious medical needs of a prisoner constitutes a violation of the Eighth Amendment's prohibition on cruel and unusual punishment, the mere fact that a patient is a prisoner does not convert a state tort medical malpractice claim into a constitutional violation. *See Estelle v. Gamble*, 429 U.S. 97, 101-102, 106 (1976).

13. Thus, to prevail on a deliberate indifference claim, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).

14. Where an inmate has received on-going treatment for his condition and claims that said treatment was improper or inadequate, the objective component of an

4

Eighth Amendment claim requires a showing of care so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).

15. To make such a showing, Plaintiffs must put forward medical evidence supporting the conclusion that the defendant was grossly incompetent and/or the care received was grossly inadequate. *Id.* at 740-743; *see also Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).

16. The Sixth Circuit has emphasized that "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976)).

17. Expanding on this rational, in *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021), the Sixth Circuit held that when an inmate has received care and is challenging the adequacy of that care under the Eighth Amendment "[o]ur cases require expert testimony for this different type of challenge." *Phillips*, 14 F. 4th at 537 (6th Cir. 2021).

18. Here Plaintiff complains of two (2) medical conditions, his contracted hand and his ongoing podiatric issues, for which his medical records clearly show he was receiving ongoing treatment. What Plaintiff actually complains of is a disagreement with Dr. Papendick's medical judgment that Plaintiff did not need the specific specialty care requested for these conditions in Plaintiff's 407s.

19. Thus, in order to succeed on his deliberate indifference claims against Dr. Papendick, Plaintiff must present medical evidence, through a qualified expert, that an ordinary competent physician would have approved the 407s as medically necessary for Plaintiff's complained of conditions, and that Dr. Papendick's denials of the requests and alternative treatment plans were grossly inadequate/incompetent. *Phillips*, 14 F. 4th at 536–537 (6th Cir. 2021).

20. For Plaintiff's First Amendment retaliation claim against Dr. Papendick, Plaintiff must show three (3) elements:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

21. Here, there is absolutely no evidence in the record to show that Dr. Papendick was even aware of Plaintiff's lawsuit when he denied Plaintiff's 407s based on a

lack of medical necessity, let alone that he based his decisions denying the 407 in any way on Plaintiff's filing of this lawsuit.

22. For the forgoing reasons, as more fully outlined in the accompanying brief, there is no genuine issue of material fact remaining, and Defendant Dr. Papendick is entitled to summary judgment in his favor.

WHEREFORE, Defendant KEITH PAPENDICK, M.D. respectfully requests that this Honorable Court grant his Motion for Summary Judgment, dismiss Plaintiff's Complaint against him in its entirety, and grant such other and further relief as this court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated:  May 26, 2022

/s/Ronald W. Chapman Sr.
Ronald W. Chapman Sr., M.P.A,
LL.M. (P37603)
Nicholas B. Pillow (P83927)
Attorneys for Charles Jamsen, M.D.; Mary
Boayue, P.A.; and Keith Papendick, M.D.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
npillow@chapmanlawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

DERRYL WATSON, #148946

    Plaintiff,

v.

JAMSEN et al

    Defendants,

Case No.: 2:16-cv-13770
District Judge: Linda V. Parker
Magistrate Judge: R. Steven Whalen

---

<table>
<tr>
<td>

THE LAW OFFICE OF KEITH ALTMAN
Keith Altman (P81702)
Attorney for Plaintiff
33228 West 12 Mile Rd., Suite 375
Farmington Hills, MI 48331
(516) 456-5885
kaltman@lawampmmt.com

RADNER LAW GROUP, PLLC
Solomon M. Radner (P73653)
Co-Counsel for Plaintiff
17515 W. Nine Mile Rd., Ste. 1175
Southfield, MI 48075
(313) 355-3425
solomon@radnerlawgroup.com

</td>
<td>

CHAPMAN LAW GROUP
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Nicholas B. Pillow (P83927)
Attorneys for Charles Jamsen, M.D.,
Keith Papendick, M.D. and
Mary Boayue, P.A.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
npillow@chapmanlawgroup.com

</td>
</tr>
</table>

---

## BRIEF IN SUPPORT OF DEFENDANT KEITH PAPENDICK, M.D.'S MOTION FOR SUMMARY JUDGMENT

## PROOF OF SERVICE

# <u>TABLE OF CONTENTS</u>

INDEX OF AUTHORITIES.....................................................................................iii

INDEX OF EXHIBITS.........................................................................................v

STATEMENT OF ISSUES PRESENTED..............................................................vi

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT........vii

I.   STATEMENT OF RELEVANT FACTS..........................................................1

  A.  Podiatric Care and Follow-Up:........................................................2

  B.  Plaintiff's Request for a Replacement Shoe:....................................7

  C.  Plaintiff's Right Hand Dupuytren's Contracture: ...........................9

II.   LEGAL STANDARD ....................................................................................13

III.   ARGUMENT................................................................................................15

  A.  Plaintiff's Claims Against Dr. Papendick are Waived Because They Were
  Not Included in the Joint Final Pretrial Order. ....................................15

  B.  Plaintiff's 42 U.S.C. § 1983 Deliberate Indifference Claims Against Dr.
  Papendick Fail as a Matter of Law. ......................................................16

    1.   *The Legal Standard for a Deliberate Indifference Claim* ...........16

    2.   *Plaintiff Cannot Demonstrate the Ongoing Care He Received Was
    Grossly Incompetent.* .........................................................................17

  C.  Plaintiff's First Amendment Retaliation Claims Against Dr. Papendick Fail
  as a Matter of Law. ...............................................................................23

IV.   CONCLUSION AND RELIEF SOUGHT....................................................24

## INDEX OF AUTHORITIES

**CASES**                                                                    **PAGE**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)............................................. vii, 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................... vii, 13

*Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017) ............................... ix, 19

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004) ........................ passim

*Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146 (6th Cir. 1995).................15

*Duchon v. Cajon Co.*, 791 F.2d 43 (6th Cir. 1986) ..................................................14

*Estelle v. Gamble*, 429 U.S. 97, 101-102 (1976)............................................. passim

*Everson v. Leis*, 556 F.3d 484 (6th Cir. 2009).........................................................14

*Farmer v. Brennen*, 511 U.S. 825 (1994) ...........................................................4, 17

*Ferrari v. Ford Motor Co.*, 826 F.3d 885 (6th Cir. 2016).........................................14

*Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377 (6th Cir.

   2004) ................................................................................................................5, 21

*Gregory v. Shelby Cty., Tenn.,* 220 F.3d 433 (6th Cir. 2000)...................... 3, vii, 15

*Hicks v. Frey*, 999 F.2d 1450 (6th Cir. 1993)........................................................ viii

*Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985)...............................................14

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) ..................................15

*Miller v. Calhoun Cty.*, 408 F.3d 803 (6th Cir. 2005) .........................................5, 17

*Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001)..........................................5

*Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454 (6th Cir. 2013).....14

*Pearson v. Prison Health Serv.*, 850 F.3d 526 (3rd Cir. 2017) ...............................18

*Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021) ......................................... passim

*Rhinehart v. Scutt*, 894 F.3d 721 (6th Cir. 2018).................................... 5, 17, 18, 21

*Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776 (6th Cir. 2003)..22

*Santiago v. Ringle*, 734, F.3d 585 (6th Cir. 2013)...................................................17

*Scott v. Harris*, 550 U.S. 372 (2007) ....................................................................14

*Skinner v. Bolden*, 89 Fed. Appx. 579 (6th Cir., Mar. 12, 2004)...........................24

*Street v. JC Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) ...................................15

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ............................ 6, ix, 23, 24

*Vance, by & Through Hammons v. United States*, 182 F.3d 920 (6th Cir. 1999)...22

*Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976).................................................. 5, viii

*Wiley v. Henry Ford Cottage Hosp.*, 257 Mich. App. 488; 668 NW2d 402 (2003)

 ...............................................................................................................................18

*Williams v. Mehra*, 186 F.3rd 685 (6th Cir. 1999) ................................................. viii

*Wilson v. Muckala,* 303 F.3d 1207 (10th Cir. 2002) ................................... 3, vii, 15

*Wilson v. Seiter*, 501 U.S. 294 (1991) .................................................................... viii

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ........................................................... viii

## Statutes      Page

42 U.S.C. § 1983 ................................................................................................ vii

## Rules      Page

E.D. Mich. L.R. 16.2................................................................................ 3, vii, 15

Fed. R. Civ. P. 16(e)................................................................................. 3, vii, 15

Fed. R. Civ. P. 37(c)(1)................................................................................... 22

Fed. R. Civ. P. 56 ..................................................................................... vii, 13

## <u>INDEX OF EXHIBITS</u>

**EXHIBIT A**        Relevant MDOC Medical Records (*filed under seal*)

## <u>STATEMENT OF ISSUES PRESENTED</u>

I.  WHETHER PLAINTIFF'S CLAIMS AGAINST DEFENDANT KEITH PAPENDICK, M.D., SHOULD BE DEEMED WAIVED BECAUSE THEY WERE NOT INCLUDED IN THE JOINT FINAL PRETRIAL ORDER.

   DEFENDANTS ANSWER:        YES.
   PLAINTIFF ANSWERS:         NO.


II. WHETHER DEFENDANT KEITH PAPENDICK, M.D., IS ENTITLED TO SUMMARY JUDGMENT, BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT REGARDING PLAINTIFF'S EIGHTH AMENDMENT CLAIMS AGAINST HIM.

   DEFENDANTS ANSWER:        YES.
   PLAINTIFF ANSWERS:         NO.


III. WHETHER DEFENDANT KEITH PAPENDICK, M.D., IS ENTITLED TO SUMMARY JUDGMENT, BECAUSE THERE IS NO GENUINE ISSUE OF MATERIAL FACT REGARDING PLAINTIFF'S FIRST AMENDMENT CLAIMS AGAINST HIM.

   DEFENDANTS ANSWER:        YES.
   PLAINTIFF ANSWERS:         NO.

## <u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

Pursuant to Fed. R. Civ. P. 16(e) and E.D. Mich. L.R. 16.2, the Joint Final Pretrial Order supersedes the pleadings and governs the course of trial unless modified by further order. Any claims or defenses not raised in the final pretrial order are forfeited and deemed waived. See *Gregory v. Shelby Cty., Tenn*., 220 F.3d 433, 442-43 (6th Cir. 2000) ("This Circuit has held that a party's failure to advance a theory of recovery in a pretrial statement constitutes waiver of that theory."); *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint . . . .").

A claim made by an inmate or detainee that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To state a 42 U.S.C. § 1983 claim for a violation of a

prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle*, *supra*. To succeed on a claim of deliberate indifference, Plaintiff must satisfy two elements, an objective one and a subjective one. He must show he had a serious medical need, and he must show that defendant, being aware of that need, acted with deliberate indifference to it. *Wilson, supra*; *Williams v. Mehra*, 186 F.3rd 685, 691 (6th Cir. 1999).

Deliberate indifference entails more than mere negligence. *Estelle*, 429 U.S. at 104; *Hicks v. Frey*, 999 F.2d 1450, 1455 (6th Cir. 1993). The courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d 857 at n.5.

In *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021), the Sixth Circuit reasoned "it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim." *Id.* at 535.

The *Phillips* Court held that when an inmate has received care and is challenging the adequacy of that care under the Eighth Amendment "[o]ur cases require expert testimony for this different type of challenge." *See Id.* at 537; citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004); *Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017).

To establish a First Amendment, claim for retaliation Plaintiff must have shown that he (1) engaged in protected conduct, (2) suffered an adverse action which would deter a person of ordinary firmness from continuing to engage in the protected conduct; and (3) the adverse action was motivated at least in part by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

## I.   STATEMENT OF RELEVANT FACTS

On October 21, 2016, Plaintiff Derryl Watson filed his Complaint in this matter, alleging Charles Jamsen, M.D. and Mary Boayue, P.A. ("Defendants") provided him with inadequate medical care under the Eighth Amendment. (**ECF No. 1**). On May 24, 2018, the Court granted Plaintiff's request to supplement his Complaint to add Keith Papendick, M.D. as a Defendant. (**ECF Nos. 54** and **62**). Plaintiff's supplement to the Complaint did not alter his claims against Defendants, but rather added three (3) deliberate indifference allegations against Dr. Papendick related to his denial of consultation requests ("407s") and a First Amendment retaliation claim alleging Dr. Papendick denied the 407s because Plaintiff had brought this lawsuit. More specifically, Plaintiff alleged Dr. Papendick:

- Improperly denied a 407 for Plaintiff to be seen by podiatrist Dr. Matthew Page for a six (6) month follow-up appointment in February 2017.
- Improperly denied a 407 for Plaintiff to be seen by an orthopedic surgery specialist for surgical treatment of hand condition known as Dupuytren's Contracture.
- Improperly denied a 407 for Plaintiff to continue to receive a special accommodation for orthotics/orthopedic shoes in September 2017.
- Denied the above described 407s in retaliation for Plaintiff bringing the current lawsuit.

On February 1, 2021, Chapman Law Group filed its appearance as Counsel for Dr. Papendick. (**ECF No. 112**). The Case was referred to Magistrate Judge Anthony Patti for trial on July 7, 2021.  (**ECF No. 124**). Following a Status

Conference on December 13, 2021, Plaintiff waived any further discovery as to Dr. Papendick and a final pretrial conference was set for January 24, 2022. (**ECF No. 128**).

On April 14, 2022, the Court issued the Joint Final Pretrial Order, wherein, neither Plaintiff's claims section nor the issues to be litigated sections contain any mention of the claims against Dr. Papendick alleged in Plaintiff's Supplemental Complaint. (**ECF No. 132**).

## A. Podiatric Care and Follow-Up:

On March 18, 2016, Plaintiff saw podiatrist Mathew Page, DPM for evaluation at Duane Waters Hospital ("DWH"). Dr. Page recommended surgical intervention—including a bunionectomy and hammer toe correction with Kwire pinning fixation and hammertoe repair with arthroplasty and skin plasty of the fifth toe on the left. (**ECF No. 80, *filed under seal*, pp. 7-14**). On April 19, 2016, Plaintiff underwent an outpatient bunionectomy and hammertoe repair surgery at Allegiance Hospital with Dr. Page. (***Id*. at pp. 26-33**).

On May 6, 2016, Plaintiff saw Dr. Page at DWH for a surgical follow-up visit for his left foot. Postoperative x-rays of his left foot showed no evidence of hardware failure, disruption and maintained alignment and fixation. Dr. Page removed the bandages and took photographs. He recommended Plaintiff follow up with him in one week for dressing change. (***Id*. at pp. 48-50**). Plaintiff saw Shawnda Johnson,

2

R.N., who submitted a request for a follow-up podiatry visit to take place on or about May 13, 2016. (***Id.* at pp. 52-54**).

On May 9, 2016, Dr. Jamsen spoke with Dr. Page and reviewed Plaintiff's past and current wound care orders. He spoke with Dr. Papendick regarding Dr. Page's request to see Plaintiff on May 12, 2016 for a follow-up appointment, and Dr. Papendick approved the request. (***Id.* at pp. 82-84, 55-56**).

On May 12, 2016, Plaintiff had his next follow-up appointment with Dr. Page. (***Id.* at p. 88**). Per Dr. Page's recommendations, on May 13, 2016, Dr. Jamsen submitted a 407 for the next podiatry follow-up in two weeks (which Dr. Papendick approved on May 18, 2016) and extended Plaintiff's wound care orders and medications. (***Id.* at pp. 92-98**). Dr. Page saw Plaintiff on May 27, 2016 for a post-surgical follow up. X-rays of his left foot showed ongoing healing, alignment, and fixation. Dr. Page ordered band-aid and antibiotic ointment to be reapplied and changed daily for three to four days, after which Plaintiff was to begin bathing, showering, and soaking his foot to help alleviate some of the skin sloughing and peeling. No further bandages otherwise were needed. He recommended another follow-up appointment in one month. (***Id.* at pp. 130-135**). On May 31, 2016, Dr. Jamsen requested a podiatry follow-up visit for Plaintiff, which Dr. Papendick approved on June 2, 2016. (***Id.* at pp. 145-148**).

On June 3, 2016, Plaintiff had another follow-up visit with Dr. Page. Dr. Page noted that since the last visit, Plaintiff developed an area of initially clear drainage over the top of his left foot bunion incision that recently developed a more purulent appearance. Dr. Page suspected a possible stitch abscess along the bunion incision. He ordered a wound culture with continued antibiotics, restarting dressing changes (daily), and recommended another follow-up visit in one month. (***Id*. at pp. 157-158**). On June 9, 2016, Dr. Jamsen reviewed additional, dictated orders received from Dr. Page and implemented them. He noted that the wound culture results were available and that he was continuing the same antibiotics based upon the results. (***Id*. at pp. 180-183, 187-188).**

On June 17, 2016, Dr. Jamsen saw Plaintiff and found there was a left foot dorsal surface half-centimeter open wound surrounded by a five-centimeter diameter area of mild swelling with no induration and no increased warmth. There were no signs of frank infection and no need for more antibiotics. Dr. Jamsen ordered a detail for no prolonged standing detail until he is seen in July. (***Id*. at pp. 217-218, 220-221**). On June 20, 2016, Hannah Dunn, R.N. noted "increased warmth, increased redness, increased swelling, drainage, increased pain." She referred Plaintiff to Dr. Jamsen for an unscheduled provider visit (***Id*. at pp. 230-233**). Dr. Jamsen noted that with the recent increased swelling there was concerning signs for infection. He

started Plaintiff on a seven-day course of antibiotics, which Plaintiff received as keep-on-person medication. (***Id*. at pp. 234-235**).

On July 8, 2016, Dr. Page saw Plaintiff for a follow up visit. An x-ray of his left foot showed incompletely healed bunionectomy and osteotomy of the proximal phalanx and great toe. Osteomyelitis could not be ruled out. The area of concern over the bunion incision had fully closed. Dr. Page recommended using Vaseline and Eucerin lotion to keep the foot hydrated, as well as scar massage. He was to continue with a gym shoe and was instructed on range of motion and stretching exercises. He planned to follow up with him in three months for final x-rays. (***Id*. at pp. 278-281**). On July 15, 2016, Dr. Jamsen submitted a 407 for a podiatry follow up visit in one month. Dr. Papendick approved the request on July 19, 2016. (***Id*. at pp. 283-286, 288-293**).

Dr. Page saw Plaintiff for a follow-up visit on August 5, 2016. (***Id*. at pp. 345-349**). The x-ray report dated August 5, 2016 showed progression in healing at a bunionectomy site, however, Dr. Page's note from that same date stated that the re-exposed radiographs showed further lucency around the screw head of the bunion, suggestive of screw loosening and possibly infected hardware. Dr. Page explained to Plaintiff that he would need a surgery for incision and drainage ("I&D") of left foot with removal of hardware and to obtain an intra-operative culture of curettage

of bone. Dr. Page noted that the surgery should be scheduled as soon as possible over the next several weeks. (***Id*. at pp. 347-348**).

Plaintiff's I&D occurred as an outpatient procedure on August 16, 2016. (***Id*. at pp. 383-389**). On August 18, 2016, Dr. Jamsen submitted a 407 for podiatry follow-up and scheduled provider follow up for the end of August 2016. Dr. Papendick approved the request for podiatry follow-up on August 19, 2016. (***Id*. at pp. 400-406**). On August 26, 2016, Plaintiff had follow-up x-rays. Osteomyelitis could be completely discounted based on the x-rays. (***Id*. at p. 423**).

On September 9, 2016, Dr. Page saw Plaintiff for a follow-up visit. He instructed Plaintiff to continue on the antibiotics as prescribed for the total six weeks' duration and to continue naproxen as needed for pain. Dr. Page recommended a referral to physical therapy/orthotics for fitting of new shoes and orthotics and requested that Plaintiff return for another follow-up visit in six months for a final check and x-rays. (***Id*. at p. 464**).

On September 15, 2016, Dr. Jamsen submitted a request for three orthotic shoe appointments at DWH. Dr. Papendick approved this request the same day. (***Id*. at pp. 469-474**) On October 11, 2016, Duane Hoeppne, BOCO took a cast and measured Plaintiff for custom foot orthotics. He requested ACMO approval and 407 for a follow-up visit. (***Id*. at pp. 479-481**). On November 10, 2016, Plaintiff received his custom orthotics and orthopedic shoes. (***Id*. at p. 500**). On January 19, 2017,

Plaintiff presented for his chronic care visit. Dr. Jamsen noted his orthopedic shoes were working well. (***Id*. at pp. 505-510**).

On February 9, 2017, Dr. Jamsen completed a chart review and submitted a 407 for the six-month podiatry follow-up appointment that Dr. Page requested. Dr. Jamsen's 407 noted that Plaintiff had completed his course of antibiotics and his foot wound looked well healed on clinical exam. Based on Dr. Jamsen's description, Dr. Papendick deferred the 6-month follow-up request as not medically necessary at the time and provided an alternative treatment plan ("ATP") to follow-up onsite and to resubmit if the medical necessity for a podiatry consult arises. (***Id*. at pp. 516-519**). On February 13, 2017, Dr. Jamsen noted the ATP and ordered repeat x-rays of Plaintiff's left foot to occur in six (6) months, on or about March 9, 2017. (***Id*. at pp. 521-522**).

On March 10, 2017, Dr. Jamsen documented that he had reviewed the report from the March 10, 2017 x-rays. The x-rays showed "healed postoperative changes of a bunionectomy involving the left great toe with anatomic alignment and apposition." (***Id*. at pp. 524-525**).

**B. Plaintiff's Request for a Replacement Shoe:**

On September 4, 2017, Plaintiff submitted a kite noting that his orthotic shoes were now a year old and worn out and requesting a new pair. (**Ex. A, p. 45**). On September 7, 2017, Victoria Hallett, D.O. submitted a 407 for replacement of

Plaintiff's orthotic shoes. Dr. Papendick reviewed the request and determined it had not demonstrated the medical necessity of the orthotic shoe because the request had not demonstrated specific ADL deficits requiring the orthotic shoes and provided an alternative treatment plan for Plaintiff to receive a deep toe box MSI athletic shoe to address his complaints that normal shoe's toe box shape chased him pain and numbness when ambulating. (**Ex. A, pp. 46-49**). On September 8, 2017, Dr. Hallett noted the ATP for Plaintiff's shoes and scheduled an appointment with Plaintiff to discuss the decision. (**Ex. A, p. 51**).

On September 13, 2017, Dr. Hallett saw Plaintiff for a scheduled provider visit, discussing with him the decision to proceed with the deep toe box MS1 athletic shoes. Plaintiff informed Dr. Hallett that he had previously been provided the deep toe box shoes in 2011 and they had not worked to relieve his pain. Dr. Hallett then planned to re-address Plaintiff's need for orthotic shoe replacement. (**Ex. A, pp. 52-53**). On October 4, 2017, Dr. Hallett completed a chart update for Plaintiff, noting that she discussed the case and Plaintiff's needs for orthotic shoe replacement with the Dr. Bergman and was awaiting a response. (**Ex. A, p. 57**). That same day she submitted a 407 for replacement orthotic shoes. Stacy Sylvie, M.D. approved the request on October 10, 2017. (**Ex. A, pp. 58-59**).

On October 24, 2017, Plaintiff was fitted for replacement orthotic shoes with a request that he return in two weeks for a follow up. (**Ex. A, p. 61**). On October 26,

8

2017, Dr. Hallett submitted a 407 for Plaintiff's orthotics follow-up. Dr. Papendick approved the request on October 30, 2017. (**Ex. A, pp. 62-63**). On November 16, 2017, Plaintiff received his orthotic shoes. (**Ex. A, p. 77**).

### C. Plaintiff's Right Hand Dupuytren's Contracture:

At Plaintiff's chronic care visit with Dr. Jamsen on July 20, 2017, he was evaluated regarding a contracted tendon at his right fifth hand digit. Dr. Jamsen noted the problem began approximately ten years prior but had recently gotten worse. Dr. Jamsen prescribed Naprosyn 500mg to address the pain caused by the contracture. (**ECF No. 80,** *filed under seal*, **pp. 311-314**).

At Plaintiff's January 19, 2017, chronic care visit, Plaintiff's hand contraction was re-evaluated. Dr. Jamsen noted that Plaintiff's right fifth digit was contracted 90 degrees at the PIP joint and could not extend. Dr. Jamsen continued Plaintiff on analgesics for the pain in his right hand, noting that he is left-handed. (***Id.* at pp. 506-508**). On April 19, 2017, Plaintiff presented for another chronic care visit with Dr. Jamsen, wherein his right-handed contracture was addressed. Dr. Jamsen continued Plaintiff on analgesics for the pain again noting that Plaintiff is left-handed. (***Id.* at pp. 531-533**). On April 26, 2017, Plaintiff submitted a kite stating that he was having trouble using his hands and would like a referral to an orthopedic surgeon. (***Id.* at pp. 541**). On May 14 and 29 2017, Plaintiff submitted two additional kites to be seen for his "right-hand contracture and 'fibroids; growing on his left

hand" and was informed that he had a medical provider visit ordered and had been put on the waiting list. (**Ex. A, pp. 2-3**).

On June 5, 2017, Plaintiff presented for a provider visit with Ronda Bryant, N.P. N.P. Bryant noted Plaintiff was complaining of his right hand getting worse and having 10/10 pain with an inability to open his hand. Plaintiff noted to N.P. Bryant that the issue had started years prior but had gotten worse in the last month. He also noted fibroids on his left hands and requested a referral to an orthopedic surgeon. NP Bryant ordered an x-ray of Plaintiff's right hand and noted that she would consider a 407 for an orthopedic consult. (**Ex. A, pp. 9-10**).

On June 9, 2017, Plaintiff underwent an x-ray of his right hand, which showed a likely chronic deformity of the fifth digit with no acute fracture or osseous abnormality. (**Ex. A, pp. 11**). On June 12, 2017, Plaintiff presented for a provider visit with N.P. Bryant. N.P. Bryant noted that Plaintiff's contracture began in 2008 and had progressively worsened over the past couple of months. In conflict with Dr. Jamsen's previous notes, N.P. Bryant noted Plaintiff was right-handed and that the disability was causing some difficulty with his ADLs. N.P. Bryant submitted a 407 for Plaintiff to receive an orthopedic surgery consultation for his progressive right fifth digit contracture. On June 13, 2017, Dr. Papendick determined an orthopedic consultation was not medically necessary as the 407 had not demonstrated a deficit in Plaintiff's ADLs caused by the pinky contracture. (**Ex. A, pp. 12-18**).

On June 19, 2017, Dr. Jamsen completed a chart update noting the lack of ADL deficit demonstrated by the 407 and indicating that he would discuss the issue with Plaintiff his next chronic care visit. (**Ex. A, pp. 19-20**). On July 12, 2017, Plaintiff submitted a kite claiming that the Health Utilization Manager was supposed to "get with" Dr. Jamsen regarding resubmitting the 407, and that the condition could not wait until his next chronic care visit on July 20, 2017, to be addressed. (**Ex. A, p. 26**). On July 17, 2017, R.N. Lester entered an administrative note that he had discussed Plaintiff's hand contracture with his medical provider, and it was determine that his condition was ongoing and could wait to be addressed at the chronic care visit. (**Ex. A, p. 27**).

On July 20, 2017, Plaintiff presented for his chronic care visit with Dr. Hallett. Dr. Hallett noted an extensive history of changes to Plaintiff's hands and feet, that Plaintiff is left-handed, and that he has a deformity to his fifth digit secondary to a fracture that did not heal properly. Dr. Hallett reviewed Plaintiff's prior 407 for an orthopedic surgery consult and indicate she would confer with colleagues on further care. (**Ex. A, pp. 28-32**). On July 27, 2017, Michelle Couling, R.N. took photos of Plaintiff's right hand to demonstrate the deformity for a resubmission of a 407 for orthopedic surgery consult. (**Ex. A, pp. 34-37**). On July 31, 2017, Dr. Hallett submitted a renewed 407 for an orthopedic consultation noting that Plaintiff had a deformity on his right fifth digit causing diminished function and moderate

discomfort. Dr. Hallett's 407 further noted that surgery may slow the process of progression of Plaintiff's contracture and that they would be looking into steroid injections for the other nodules on his palms. That same day, Dr. Papendick reviewed the 407 and determined that the medical necessity of an orthopedic surgery consult had not been demonstrated and provided an ATP with instructions for the treater to resubmit another request with more information on historical and physical finding, imaging, laboratory evaluations, and ADL deficit and risk to life or limb to demonstrate the medical necessity of the consult. (**Ex. A, pp. 38-41**).

The issue of Plaintiff's hand contracture did not arise again until November 2017. On November 2, 2017, Dr. Hallett completed a chart update on Plaintiff indicating he had been seen in the yard complaining of his hand contracture. (**Ex. A, pp. 66-67**). On November 7, 2017, Plaintiff presented to Dr. Hallett for a provider visit to receive steroid injections for the nodules on his left fourth digit. Dr. Hallett noted contracture at the fourth and fifth digit of the right hand causing non-function and pain with flexion and extension bilaterally. Plaintiff received an injection of plain 2% lidocaine and 10mg of Kenalog into the fourth palmer tendon of his left hand. He is noted as tolerating the procedure well. (**Ex. A, pp. 69-70**). On November 14, 2017, Dr. Hallett submitted a 407 for Plaintiff to receive an orthopedic surgery consult. The request further indicated that Plaintiff experiences numbness and cramping in his hand four times a week that leaves over time. Plaintiff is noted as

having difficulty writing and holding his cane. The pictures of Plaintiff's hand were once again included to demonstrate the deformity. (**Ex. A, pp. 72**). That same day Plaintiff was seen by Dr. Hallett for a steroid injection into his right hand and is noted as tolerating the procedure well. (**Ex. A, pp. 75-76**). On November 16, 2017, Dr. Papendick determined that the photographs submitted with the November 14, 2017, 407 did not adequately demonstrate a degree of ADL deficit warranting the requested orthopedic surgery consult and provided an alternative treatment plan. (**Ex. A, pp. 73**).

On November 20, 2017, Dr. Hallett saw Plaintiff for a provider visit and discussed with him the ATP for his right pinky contracture. Dr. Hallett provided Plaintiff with new stretches to help alleviate the tension in his hands and a prescription for Betamethasone with instructions to apply it daily to the palms and contracted fingers of his hands. (**Ex. A, pp. 78-79**).

## II.   LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact."

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6ᵗʰ Cir. 1985).

In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986). However, a party opposing a motion for summary judgment must do more than simply show that there is some "metaphysical doubt" as to the material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quotations and citation omitted). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial. . . . ." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). Conclusory statements without demonstrated evidentiary support will not defeat a motion for summary judgment. *Ferrari v. Ford Motor Co.*,826 F.3d 885,897-898 (6th Cir. 2016) (quoting *Pearce v. Faurecia Exhaust Systems, Inc.*, 529 Fed. Appx. 454,458 (6ᵗʰ Cir. 2013). Moreover, a plaintiff cannot simply "replace

14

conclusory allegations of the complaint . . . with conclusory allegations of an affidavit. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990). As the Sixth Circuit stated, a party responding to a summary judgment motion must "put up" supporting evidence or "shut up" regarding his claim. *Street v. JC Bradford & Co*., 886 F.2d 1472, 1478 (6th Cir. 1989); *Cox v. Kentucky Dept. of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995).

## III. <u>ARGUMENT</u>

### A. Plaintiff's Claims Against Dr. Papendick are Waived Because They Were Not Included in the Joint Final Pretrial Order.

Pursuant to Fed. R. Civ. P. 16(e) and E.D. Mich. L.R. 16.2., the Joint Final Pretrial Order supersedes the pleadings and governs the course of trial unless modified by further order. Any claims or defenses not raised in the final pretrial order are forfeited and deemed waived. See *Gregory v. Shelby Cty., Tenn*., 220 F.3d 433, 442-43 (6th Cir. 2000) ("This Circuit has held that a party's failure to advance a theory of recovery in a pretrial statement constitutes waiver of that theory."); *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) ("[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint . . . .").

Here, the Joint Final Pretrial Order is completely devoid of the allegations against Defendant Dr. Papendick. The "Plaintiff's Claims" section focusses solely on the timeframe between Plaintiff's surgery on April 19, 2016 and the start of his

15

follow up care with Dr. Page on May 6, 2016, and does not even mention any of the claims against Dr. Papendick alleged in the supplemental complaint. (**ECF Nos. 54, 132**). Likewise, the issues to be litigated sections do not contain any reference to the issues of law and fact presented by the claims in Plaintiff's supplemental Complaint. In fact, Plaintiff's need for orthopedic shoes or evaluation of his Dupuytren's Contracture are not mentioned anywhere in the Joint Final Pretrial Order. (**ECF No. 132**). Accordingly, Plaintiff's claims against Dr. Papendick should be deemed waived and Dr. Papendick should be dismissed from this matter prior to it proceeding to trial.

### B. Plaintiff's 42 U.S.C. § 1983 Deliberate Indifference Claims Against Dr. Papendick Fail as a Matter of Law.

#### 1. The Legal Standard for a Deliberate Indifference Claim

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment and applies to the States through the Fourteenth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 101-102 (1976). The Supreme Court has held that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Id.* at 104. Still, this does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id.* at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or

omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).

### 2.  *Plaintiff Cannot Demonstrate the Ongoing Care He Received Was Grossly Incompetent.*

When an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness. *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (quoting *Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005)).  The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment.  *Id.*  There must be "medical proof that the provided treatment was not adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734, F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony…showing the medical necessity

17

for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Rhinehart*, 894 F.3d at 738. *See also Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3ʳᵈ Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment. *Id.* (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6ᵗʰ Cir. 2004)).

Expanding on this rational, in *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021), the Sixth Circuit was tasked with determining whether medical expert testimony is required to establish the objective component of a deliberate indifference claim based on allegations of inadequate care. Noting that "[e]ven for garden-variety negligence claims, the overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon," *Id.* at 535, the Sixth Circuit reasoned "it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim." *Id*. Looking to state tort law on the necessity of expert testimony to establish the applicable standard of care, it is easy to see why the *Phillips* Court reached the conclusion it did. As explained in the Michigan medical malpractice case of *Wiley v. Henry Ford Cottage Hosp.*, 257 Mich. App. 488; 668 NW2d 402 (2003):

18

> Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community.

In the same vein, if not more so, an ordinary layperson lacks the knowledge and experience to determine whether the actions of a medical provider treating an inmate **grossly deviated** from the care that would be provided by a reasonably prudent physician. Accordingly, the *Phillips* Court held that when an inmate has received care and is challenging the adequacy of that care under the Eighth Amendment "[o]ur cases require expert testimony for this different type of challenge." *See Phillips*, 14 F. 4th at 537 (6h Cir. 2021); citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004); *Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017).

Here, it cannot be disputed that Plaintiff received ongoing treatment for both his podiatry issues and his hand contracture and is merely disagreeing with the medical decision making of Dr. Papendick in refusing to approve the specific specialty care requested in favor of more conservative onsite treatment.

Plaintiff's medical records clearly demonstrate that he received extensive treatment for his podiatry issues, including several visits to Dr. Page on May 6, May 12, May 27, June 3, July 8, August 5, August 16 (for an outpatient procedure), and September 9, 2016, all for follow-up regarding his podiatry issues originating in

19

March 2016. By the time of the request for the March 2017 follow-up appointment, February 9, 2017, Plaintiff was five (5) months post-op following his revision surgery in August 2016, and his foot injury is noted as being well healed. (**ECF No. 80,** ***filed under seal***, **pp. 516-519**). Dr. Papendick made the determination that he could be followed on site for any podiatry issues going forward and could resubmit for an outside consultation if it became medically necessary. (***Id.***)

Plaintiff's medical records also show he received approval for his specialty shoes for over a year prior to Dr. Papendick determining that the shoes were no longer medically necessary. The rationale for needing the orthotic shoes outlined in Plaintiff's September 7, 2017, 407 was that the toe box was too small causing pain and difficulty ambulating. Reviewing this, Dr. Papendick made the determination that the specific orthotic shoes requested were not medically necessary as there were other options available to help with Plaintiff's stated problem of needing a larger toe box. (**Ex. A, pp. 46-49**). Once more information was available on his shoe history and how the alternative shoes had not worked for him in the past, he received approval for his orthotic shoes, including Dr. Papendick approving his follow-up appointment for orthotics on October 31, 2017, and he received his replacement orthotic shoes November 16, 2017. (**Ex. A, pp. 62-63, 77**).

The medical records likewise show Plaintiff received ongoing care for his diagnosis of Dupuytren's Contracture. Each time he complained about his hand

20

issues he was evaluated and was continually provided analgesic medication to help with the pain. Plaintiff even received steroid injections in both hands to try and alleviate his symptoms. (**Ex. A, pp. 69-70, 75-76**). Plaintiff takes issue with the fact he did not receive the specific orthopedic surgery consultation he felt was needed to address the issue. Dr. Papendick disagreed. Plaintiff's medical records make clear the issue was a long-standing problem affecting Plaintiff's non-dominant hand, and each of the 407's submitted to Dr. Papendick failed to clearly outline how the contracture on his non-dominant hand was causing deficits in his ADLs significant enough to call for an orthopedic surgery consult. Thus, once again, Plaintiff is seeking to second guess the medical decision making of Dr. Papendick.

The facts on the record do not support a finding that Dr. Papendick was grossly incompetent in providing alternate treatment plans for Plaintiff's follow-up podiatry care and Dupuytren's Contracture. *Phillips,* 14 F. 4th at 537 (6th Cir. 2021); *Rhinehart,* 894 F.3d at 737 (6th Cir. 2018). Even if another physician may have approved the at issues 407's without modification, it is still a matter of medical judgment, and Plaintiff's disagreement with Dr. Papendick's decisions hardly rises to the level negligence, let alone a constitutional violation. *Estate of Graham,* 358 F.3d 377, 385 (6th Cir. 2004).

Moreover, Plaintiff has no medical expert to support a contention that Dr. Papendick's decision to provide Plaintiff with an alternate follow-up treatment plan

was grossly incompetent. As discussed above, the adequacy of medical care and what course of treatment is appropriate for a given patient and whether a physician's chosen course of treatment was appropriate is beyond the knowledge of lay individuals and requires expert testimony for a jury to navigate and make an informed decision. Plaintiff however has not named a single expert in this matter and should not be allowed an eleventh-hour addition.

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The party who is potentially subject to sanctions bears the burden of proving harmlessness or justification. *Roberts ex rel. Johnson v. Galen of Virginia*, *Inc*., 325 F.3d 776, 782 (6th Cir. 2003). An omission is harmless if it "involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance, by & Through Hammons v. United States*, 182 F.3d 920 (6th Cir. 1999).

Here, Plaintiff has made no effort whatsoever to diligently retain a qualified expert to testify on his behalf, or to disclose the identity of any potential experts and the anticipated subject matter of their testimony. Plaintiff has simply chosen to ignore the requirement of supporting his allegations with expert testimony and proceed as if the requirement does not exist.

22

This case is now over 5 years old, discovery is long closed, and a trial date has been set, and Plaintiff should not be allowed an eleventh-hour amendment to add an expert witness. Plaintiff's noncompliance with expert witness disclosures cannot be characterized as "harmless," because it has prevented Defendant from being able to effectively analyze the opinions of Plaintiff's experts, formulate their defense to same, and prepare their own expert to effectively counter the opinions of Plaintiff's experts.

## C. Plaintiff's First Amendment Retaliation Claims Against Dr. Papendick Fail as a Matter of Law.

To establish a First Amendment, claim for retaliation Plaintiff must have shown that he 1) engaged in protected conduct; 2) suffered an adverse action which would deter a person of ordinary firmness from continuing to engage in the protected conduct; and 3) the adverse action was motivated at least in part by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

Here Plaintiff alleges that Dr. Papendick retaliated against him for "pursuing the present legal argument." Plaintiff, however, does not explain how Dr. Papendick was aware of this lawsuit before he was named as a Plaintiff or even allege that Dr. Papendick was aware of the lawsuit before being named. Further, Plaintiff has put forth no evidence, beyond his bald assertions, that Dr. Papendick's decision's regarding the at issue 407s were in anyway influenced by Plaintiff bringing this lawsuit. All of Dr. Papendick's allegedly unconstitutional actions took place before

23

he was named in this matter and were based on his own medical judgment and evaluation of Plaintiff's medical needs.

Plaintiff's allegations do not meet the requirements for a First Amendment claim as "bare allegations of malice" are insufficient to state a constitutional claim, as Plaintiff must instead establish "that his protected conduct was a motivating factor" behind the allegedly retaliatory action taken. *Thaddeus-X*, 175 F.3d at 399 (citations omitted). Conclusory allegations of retaliatory motive are insufficient, however. See *Skinner v. Bolden*, 89 Fed. Appx. 579, 579-80 (6th Cir., Mar. 12, 2004). Moreover, even if Plaintiff could make such a showing, Dr. Papendick has demonstrated that his decisions regarding Plaintiff's 407s were based on his medical judgment.

Accordingly, this Court should dismiss Plaintiff's retaliation claim against Dr. Papendick in its entirety.

## IV.   CONCLUSION AND RELIEF SOUGHT

Plaintiff's allegations against Dr. Papendick are nothing more than a disagreement with the medical decision making a treating provider and do not rise to the level of a constitutional violation. Dr. Papendick reviewed the requested specialty care, reviewed the justifications provided with each request and made a determination as to the medical necessity of each request, and provided ATPs which he felt, in his medical opinion, were more appropriate for Plaintiff. The fact that

Plaintiff disagrees with those decisions does not create a cause of action. The decisions were not made in retaliation for Plaintiff bringing this lawsuit and Plaintiff has no medical experts to testify that the decisions were grossly incompetent. Accordingly, this Court should dismiss all claims against Dr. Papendick in their entirety.

WHEREFORE, Defendant KEITH PAPENDICK, M.D. respectfully request that this Honorable Court grant his Motion for Summary Judgment, dismiss Plaintiff's Complaint against him in its entirety, and grant such other and further relief as this court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated: May 26, 2022

/s/ Ronald W. Chapman Sr.
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Attorney for Corizon Defendants
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com

**<u>PROOF OF SERVICE</u>**

I hereby certify that on May 26, 2022, I presented the foregoing paper to the Clerk of the Court for filing and uploading to the ECF system, which will send notification of such filing to the attorneys of record listed herein and I hereby certify that I have mailed by US Postal Service the document to the involved non participants.

Ronald W. Chapman Sr., M.P.A., LL.M. (P37603)
1441 W. Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com